**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INVENTOR HOLDINGS, LLC, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-1067-LPS |
| | : | |
| GAMELOFT, INC., | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| INVENTOR HOLDINGS, LLC, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-1068-LPS |
| | : | |
| GLU MOBILE INC. | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| INVENTOR HOLDINGS, LLC, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-1070-LPS |
| | : | |
| KING.COM LTD., | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| INVENTOR HOLDINGS, LLC, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-1071-LPS |
| | : | |
| NGMOCO, LLC, | : | |
| | : | |
| Defendant. | : | |

INVENTOR HOLDINGS, LLC,                    :
                                           :
           Plaintiff,                      :
                                           :
      v.                                   :      C.A. No. 14-1072-LPS
                                           :
ROVIO ANIMATION COMPANY,                   :
                                           :
           Defendant.                      :
_____

INVENTOR HOLDINGS, LLC,                    :
                                           :
           Plaintiff,                      :
                                           :
      v.                                   :      C.A. No. 14-1073-LPS
                                           :
SUPERCELL, INC.,                           :
                                           :
           Defendant.                      :
_____

Stamatios Stamoulis, Richard C. Weinblatt, STAMOULIS & WEINBLATT LLC, Wilmington, DE.

     Attorneys for Plaintiff Inventor Holdings, LLC.


Jack B. Blumenfeld, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE.

Eric A. Buresh, Michelle L. Marriott, Mark Lang, ERISE IP, P.A., Overland Park, KS.

     Attorneys for Defendant Gameloft, Inc.


Steven L. Caponi, BLANK ROME LLP, Wilmington, DE.

     Attorney for Defendant King.com Ltd.

Richard L. Horwitz, David E. Moore, Bindu A. Palapura, POTTER ANDERSON & CORROON LLP, Wilmington, DE.

Michael J. Sacksteder, Lauren E. Whittemore, Hana K. Andersen, FENWICK & WEST LLP, San Francisco, CA.

Carolyn C. Chang, FENWICK & WEST LLP, Mountain View, CA.

Attorneys for Defendants Glu Mobile Inc., ngmoco, LLC, Rovio Animation Company, and Supercell, Inc.

---

## MEMORANDUM OPINION

September 30, 2015
Wilmington, Delaware

STARK, U.S. District Judge:

## I. INTRODUCTION

Pending before the Court are Defendant Gameloft, Inc.'s ("Gameloft") Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c) (C.A. 14-1067, D.I. 13) and Defendants King.com Ltd. ("King.com"), Glu Mobile Inc. ("Glu Mobile"), ngmoco, LLC ("ngmoco"), Rovio Animation Company ("Rovio"), and Supercell, Inc.'s ("Supercell") (collectively with Gameloft, "Defendants") Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (C.A. 14-1068, D.I. 10; C.A. 14-1070, D.I. 11, D.I. 16; C.A. 14-1071, D.I. 10; C.A. 14-1072, D.I. 10; C.A. 14-1073, D.I. 10).[1] Although Defendants' motions are separately briefed, they raise essentially the same arguments, and the Court will address them collectively. For the reasons discussed below, the Court will grant Defendants' motions.[2]

## II. BACKGROUND

U.S. Patent No. 8,784,198 ("the '198 patent"), entitled "Method and Apparatus for Conducting or Facilitating a Promotion," "relates generally to a method and apparatus for conducting a promotion and, more particularly, to a method and apparatus for distributing promotions to potential participants and for allowing the promotion participants to receive benefits associated with the promotions." ('198 patent at 1:28-32) It was filed on January 4, 2013 and issued on July 22, 2014. (*Id.*) The claimed methods are generally directed to "facilitating play of a game" on a "mobile device" or "computer-readable medium" in which a

---

[1]The referral of these motions to Magistrate Judge Burke (*see, e.g.,* C.A. 14-1071, D.I. 6) will be vacated.

[2]Defendant Kabam Inc. has settled with Plaintiff. (*See* C.A. 14-1069, D.I. 10)

user receives an "in-game benefit" after a "locked outcome" of the game is unlocked using an "unlock code" associated with that outcome. (*Id.* at 38:50-39:2, 40:13-27)

On August 19, 2014, Plaintiff Inventor Holdings, LLC ("Inventor Holdings" or "Plaintiff") filed separate actions alleging infringement of the '198 patent against each Defendant: Gameloft (C.A. 14-1067, D.I. 1), Glu Mobile (C.A. 14-1068, D.I. 1), King.com (C.A. 14-1070, D.I. 1), ngmoco (C.A. 14-1071, D.I. 1), Rovio (C.A. 14-1072, D.I. 1), and Supercell (C.A. 14-1073, D.I. 1). The cases have not been consolidated.[3]

Gameloft answered Plaintiff's complaint on October 10, 2014. (C.A. 14-1067, D.I. 9) Gameloft subsequently filed its Motion for Judgment on the Pleadings on November 21, 2014. (C.A. 14-1067, D.I. 13) Briefing on Gameloft's motion was completed on December 18, 2014. (C.A. 14-1067, D.I. 14, 18, 22) Thereafter, Gameloft filed a Notice of Supplemental Authority on March 25, 2015 (C.A. 14-1067, D.I. 32), to which Plaintiff filed Objections on March 26, 2015 (C.A. 14-1067, D.I. 33). Gameloft filed additional Notices of Supplemental Authority on June 16, 2015 and September 1, 2015. (C.A. 14-1067, D.I. 36, 37) On April 7, 2015, the action against Gameloft was stayed pending resolution of Gameloft's motion. (*See* C.A. 14-1067, D.I. 35)

Glu Mobile, ngmoco, Rovio, and Supercell filed their Motions to Dismiss on October 10, 2014. (C.A. 14-1068, C.A. 14-1071, C.A. 14-1072, C.A. 14-1073, D.I. 10)[4] Briefing on these

---

[3]Because Plaintiffs' briefs in response to Defendants' motions are virtually the same, the Court will only cite to Plaintiffs' responsive brief, D.I. 21, in C.A. 14-1070, which is representative.

[4]Because these Defendants' briefs and other filings are identical both in substance and timing, the Court will generally refer only to the set of briefing filed in C.A. 14-1071, which is representative.

motions was completed on November 6, 2014. (C.A. 14-1071, D.I. 11, 12, 14) Thereafter, Glu Mobile, ngmoco, Rovio, and Supercell filed Notices of Supplemental Authority on November 17, 2014 (C.A. 14-1071, D.I. 15), and Plaintiff responded with Notices of Supplemental Authority on December 12, 2014 (C.A. 14-1071, D.I. 18). Glu Mobile, ngmoco, Rovio, and Supercell filed additional Notices of Supplemental Authority on March 16, 2015, June 16, 2015 and September 1, 2015. (C.A. 14-1071, D.I. 31, 35, 36). On April 7, 2015, the actions against Glu Mobile, ngmoco, Rovio, and Supercell were stayed pending resolution of their motions. (*See* C.A. 14-1071, D.I. 34)

King.com filed its first Motion to Dismiss on November 21, 2014. (C.A. 14-1070, D.I. 11) Subsequently, Plaintiff filed an Amended Complaint on December 4, 2014 (C.A. 14-1070, D.I. 13), which King.com moved to dismiss on December 12, 2015 (C.A. 14-1070, D.I. 16). Briefing on King.com's motion was completed on January 8, 2015. (C.A. 14-1070, D.I. 17, 21, 24) Thereafter, King.com filed a Notice of Supplemental Authority on March 19, 2015 (C.A. 14-1070, D.I. 29), to which Plaintiff filed Objections on March 26, 2015 (C.A. 14-1070, D.I. 30). King.com filed additional Notices of Supplemental Authority on June 16, 2015 and September 1, 2015. (C.A. 14-1070, D.I. 33, 34) On April 7, 2015, the action against King.com was stayed pending resolution of Glu Mobile's motion. (*See* C.A. 14-1070, D.I. 32)

## III.     LEGAL STANDARDS

### A.     Motion to Dismiss for Failure to State a Claim

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a morion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996). "[A] complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859

(3d Cir. 1994).

## B.    Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter pleadings are closed – but early enough not to delay trial." When evaluating a motion for judgment on the pleadings, the Court must accept all factual allegations in a complaint as true and view them in the light most favorable to the non-moving party. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008); *see also Maio*, 221 F.3d at 482. This is the same standard as applies to a Rule 12(b)(6) motion to dismiss. *See Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

A Rule 12(c) motion will not be granted "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Rosenau*, 539 F.3d at 221. "The purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F.Supp.2d 612, 617 (D. Del. 2008); *see also Burlington Coat Factory*, 114 F.3d at 1426 (explaining that any documents integral to pleadings may be considered in connection with Rule 12(c) motion). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burlington Coat Factory*, 114 F.3d at 1420. Thus, a court may grant a motion for judgment on the pleadings (like a motion to dismiss) only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio*, 221 F.3d at 482.

5

The Court may consider matters of public record as well as authentic documents upon which the complaint is based if attached to the complaint or as an exhibit to the motion. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). The Court may also take judicial notice of the factual record of a prior proceeding. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988). Ultimately, a motion for judgment on the pleadings can be granted "only if no relief could be afforded under any set of facts that could be proved." *Turbe*, 938 F.2d at 428.

The ultimate question of patent eligibility is an issue of law, making it an appropriate basis for a Rule 12(c) motion. *See In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd Bilski v. Kappos*, 561 U.S. 593 (2010). The Federal Circuit has affirmed District Courts that have granted motions for judgment on the pleadings based on § 101 challenges. *See, e.g., OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360 (Fed. Cir. 2015); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014),

## C.     Lack of Patentable Subject Matter

Under 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." There are three exceptions to § 101's broad patent-eligibility principles: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). Pertinent here is the third category, "abstract ideas," which "embodies the longstanding rule that an idea of itself is not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (internal quotation marks omitted). "As early as *Le Roy v. Tatham*, 55 U.S. 156, 175 (1852), the

Supreme Court explained that '[a] principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.' Since then, the unpatentable nature of abstract ideas has repeatedly been confirmed." *In re Comiskey*, 554 F.3d 967, 977-78 (Fed. Cir. 2009).

In *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), the Supreme Court set out a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, courts must determine if the claims at issue are directed at a patent-ineligible concept. *See id.* If so, the next step is to look for an "'inventive concept' – i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.*

"Simply appending conventional steps, specified at a high level of generality, [is] not ***enough*** to supply an inventive concept." *Id.* at 2357 (internal quotation marks omitted; emphasis in original). In *Bilski*, 130 S. Ct. at 3231, for example, the Supreme Court held that the claims involved were drawn to the patent-ineligible abstract idea of "hedging, or protecting against risk," which was a "fundamental economic practice." Similarly, in *Alice*, 134 S. Ct. at 2356, the Supreme Court found that the claims were drawn to the patent-ineligible abstract idea of "intermediated settlement," which was also a "fundamental economic practice." In both cases, the Supreme Court found that the additional steps delineated in the claims did not embody an "inventive concept" sufficient to ensure that the patents amounted to more than patents upon the ineligible fundamental concepts themselves.

7

In determining, at the second step, if a patent embodies an inventive concept, courts may consider whether the process "is tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *Kappos*, 130 S. Ct. at 3225. "[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine must impose meaningful limits on the claim's scope." *CyberSource Corp. v. Retail Decision, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) (internal quotation marks omitted). To be "a meaningful limit on the scope of the claims," the addition of a machine "must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly." *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010). Hence, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.*

"[T]he machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." *Bilski*, 130 S. Ct. at 3227. However, it is "not the sole test for deciding whether an invention is a patent-eligible 'process.'" *Id.* "[I]n applying the § 101 exception, [courts] must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention." *Alice*, 134 S. Ct. at 2354 (internal citation and quotation marks omitted). The "concern that drives the

8

exclusionary principle [i]s one of pre-emption." *Id.* That is, where a patent would pre-empt use

of basic tools of scientific and technological work, *i.e.*, laws of nature, natural phenomena, and

abstract ideas, the patent would "impede innovation more than it would tend to promote it,

thereby thwarting the primary object of the patent laws." *Id.* (internal quotation marks omitted).

## IV. DISCUSSION

Defendants contend that all claims of the '198 patent are patent-ineligible under the

analytical framework set forth in *Mayo* and *Alice*. Specifically, Defendants argue that the '198

patent "claims the economic strategy and abstract idea of providing an 'unlock code' in exchange

for a qualifying activity for an 'outcome' to reveal the benefit of the locked 'outcome.'" (C.A.

14-1071, D.I. 11 at 2; C.A. 14-1067, D.I. 14 at 2; *see also* D.I. 17 at 2 ("The independent claims

of U.S. Patent No. 8,784,198 are directed at the abstract idea of using a code to unlock a benefit

in a game.")) Defendants further argue that "[t]he only 'inventive concept' the '198 Patent

purports to add is implementation of this unlock code concept on a generic mobile device."

(C.A. 14-1071, D.I. 11 at 2; C.A. 14-1067, D.I. 14 at 2; *see also* C.A. 14-1070, D.I. 17 at 2)

Plaintiff responds that Defendants mischaracterize the underlying concepts of the claimed

invention by "not view[ing] the claim as a whole" and ignoring the "express limitations" of the

claims. (*See* C.A. 14-1070, D.I. 21 at 10, 12) Plaintiff argues that the invention of the '198

patent is not directed to an abstract idea but instead is "particular to mobile device gaming." (*Id.*

at 12) Plaintiff emphasizes that "the claimed technology necessitates the use of discrete

computer hardware and software components configured and programmed in a particular way

that enable performance of the specified functions carried out in the context of a mobile game."

(*Id.* at 13)

Independent claim 1 recites the following:

> A mobile device operable to facilitate a game playable on the mobile device, the mobile device comprising:
>
>> an input mechanism for receiving input from a user of the mobile device;
>>
>> a display screen for outputting results of the game;
>>
>> a processor;
>>
>> a memory, the memory operable to store a first software program for conducting the game on the mobile device and a locked outcome of the game such that, upon the first software program being stored in the memory, the processor is operable with the first software program to:
>>
>>> facilitate play of the game by recognizing inputs from the user via the input mechanism;
>>>
>>> receive a signal comprising an unlock code;
>>>
>>> unlock the locked outcome of the game using the unlock code, thereby determining an unlocked outcome;
>>>
>>> determine an intra-game benefit associated with the unlocked outcome; and
>>>
>>> incorporate the intra-game benefit into the game while it is being played on the mobile device by the user.

('198 patent at 38:50-39:2)

The only other independent claim, claim 18, is similar to independent claim 1 except that its recited steps are performed by a computer-readable medium instead of a mobile device:

10

A non-transitory computer-readable medium storing
instructions for directing a processor of a mobile device to perform
a method, the method comprising:

> facilitating play of a game on the mobile device by
> recognizing inputs provided by a user via an input
> mechanism of the mobile device, at least one of the
> inputs causing progress in the game;

> receiving a signal comprising an unlock code;

> determining a locked outcome of the game;

> unlocking the locked outcome of the game using the
> unlock code, thereby determining an unlocked
> outcome;

> determining an intra-game benefit associated with
> the unlocked outcome; and

> providing the intra-game benefit to the user by
> incorporating the intra-game benefit into the game.

(*Id.* at 40:13-27)

The various dependent claims provide basic variations on the elements of the independent

claims, such as: the source of the signal being either the mobile device's "input mechanism" (*id.*

at 39:3-8, 40:38-41) or "a third party via a network" (*id.* at 39:9-15, 40:42-46); the locked

outcome being previously "stored in a memory" and subsequently "retrieved" or "accessed" (*id.*

at 40:28-37), "stored in an encrypted form" (*id.* at 39:22-27, 40:55-61), or "download[ed] . . .

over the internet" (*id.* at 39:28-31, 40:51-54); the method further comprising "receiving a request

to use a previously stored unlock code" (*id.* at 39:16-21, 40:47-50); the processor being able to

"receive indication of payment from the user . . . for the unlock code" (*id.* at 39:32-35, 40:62-65)

and further requiring "verifi[cation] that payment for the unlock code has been provided from the

user" (*id.* at 39:36-43); various forms of intra-game benefits (*id.* at 40:4-10, 40:66-41:5), including "an advancement within the game," and further requiring the unlock code for "advancement in the game" (*id.* at 39:44-48, 41:6-11); the use of a "second software program to download at least one of the first software program and a decryption algorithm into the memory" (*id.* at 39:49-53); the processor being able "to verify that the user has completed a qualifying activity that is a prerequisite to unlocking the locked outcome" (*id.* at 39:54-57, 41:12-18) and further "wherein the qualifying activity is watching a specified advertisement" (*id.* at 39:58-59, 41:19-21); and the use of a "GPS detector" (*id.* at 39:60-64, 41:22-25) and further "determin[ing] an intra-game benefit based on the location" (*id.* at 39:65-40:3, 41:26-29).[5]

Plaintiff argues that the Court should not decide patentability before ruling on claim construction, insisting, "[a]t most, Defendant has raised disputed material fact issues." (C.A. 14-1070, D.I. 21 at 15 n.7)[6] Without proposing any particular constructions for any terms, Plaintiff argues that "Defendant's arguments confirm that at least 'unlock code' and 'unlocked outcome' require construction." (C.A. 14-1070, D.I. 21 at 10 n.4) (referring to C.A. 14-1070, D.I. 17 at 6

---

[5]The Court finds that the briefing is adequate to permit it to resolve the § 101 challenge with respect to each asserted claim of the '198 patent.

[6]Plaintiff argues that because patents are presumed valid, Defendants confront a burden of proving invalidity by clear and convincing evidence. (*See* C.A. 14-1071, D.I. 12 at 6) However, Plaintiff has failed to identify a disputed fact that is material to resolution of the issue of patent eligibility here. The issue of patentability is a question of law, *see In re Bilski*, 545 F.3d at 950-51, although it is one that "may be informed by subsidiary factual issues," *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012). In the absence of underlying disputed facts, Defendants do not have the burden Plaintiff would have the Court impose on them. *See Modern Telecom Sys. LLC v. Earthlink, Inc.*, 2015 WL 1239992, at *7-8 (C.D. Cal. Mar. 17, 2015) ("Because, ordinarily, no evidence outside the pleadings is considered in resolving a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a 'clear and convincing evidence' standard – a burden of *proof* – to such motions.").

(Defendants' analogizing of the "unlock code" and "unlocked outcome" to "roll[ing] a set of doubles" and "being able to move forward [in a game]," respectively)) But the Court is not required to withhold judgment on patentability until it resolves all potential claim construction disputes. *See Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012), *cert denied*, 134 S. Ct. 2870 (2014) ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101."); *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 719 (D. Del. 2012) (deciding § 101 issue before claim construction where plaintiff failed to explain how claim construction would alter § 101 analysis); *Intellectual Ventures I LLC v. Mfrs. & Traders Trust Co.*, 2014 WL 7215193, at *6 (D. Del. Dec. 18, 2014) (proceeding with § 101 analysis after finding that "Plaintiff's arguments throughout the briefing make no mention of how the construction of certain limitations would inform the § 101 analysis" and that "parties' arguments are not focused on specific claim limitations, but instead on the broader concepts of the claims and the computer components used").

Here, the closest any party comes to showing any claim construction dispute that is relevant to the § 101 analysis is Defendants' contention (with which Plaintiffs disagree) that the "unlock code" and "unlocked outcome" terms should be construed so as to include "roll[ing] a set of doubles" and "being able to move forward [in a board game]." The Court agrees with Defendants that "the vast breadth of the claim language and the specification of the '198 Patent" (C.A. 14-1071, D.I. 11 at 19) provide a sufficient basis for the Court to resolve the particular claim construction issue raised by Plaintiff.

More precisely, the Court agrees that "unlock code" and "unlocked outcome" should be given their full, plain and ordinary meaning in the context of the '198 patent's claims.

The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history. There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (internal citation omitted). Here, neither exception is present. To the contrary, the specification emphasizes the breadth with which the inventors were using the terms "unlock code" and "unlocked outcome":

> In some embodiments, an unlock code used to unlock an outcome may include or otherwise provide some or all of the information or data needed to associate a benefit with an outcome, identify, select or otherwise determine a benefit associated with the outcome, complete a benefit being revealed by the unlock code, etc.
>
> . . .
>
> ***An unlock code can comprise or include a written, spoken or data entered password, a radio or television signal, a sequence or group of keypad selections or entries, a sequence or group of handwritten or spoken entries, an electronic or electromagnetic signal, <u>a numerical or alphanumerical sequence</u>, a sequence, group or combination of musical notes or other sounds, words, syllables, phrases, tones, etc. to be provided audibly or symbolically to unlock an outcome, a barcode, a decoding key, rule or algorithm for a code or cypher, etc. An unlock code can also be based on, include, or comprise an identifier*** associated with a particular user, user device, intermediary, intermediary device, etc. receiving the unlock code or otherwise being allowed to use or distribute the unlock code.
>
> ***An unlock code may also include user biometric information*** (e.g., voiceprint, fingerprint, retinal scan, DNA, etc. information) so that the unlock code may only be used by a specific user.

('198 patent at 5:16-59) (emphasis added) Defendants' example of "roll[ing] a set of doubles" is

14

"a numerical or alphanumerical sequence" and comes within the plain and ordinary meaning of "unlock code."

Likewise, the patent specification expressly indicates that "unlocked outcome" should be broadly construed to have its plain and ordinary meaning. To begin with, "locked" encompasses virtually all ways that the outcome can be locked:

> *The term "locked," as used herein, should be construed broadly and is not meant to imply or suggest any specific manner or method* of hiding, covering, encoding or encrypting, storing, screening, concealing, masking, etc. a prize, value, symbol, or other benefit associated with an outcome or to limit how a prize, value, symbol, or other benefit associated with the outcome is hidden, covered, encoded or encrypted, stored, screened, concealed, masked, etc.

(*Id.* at 5:7-15) (emphasis added) Similarly, "outcome" includes a large variety of outcomes:

> *The outcomes may be a symbol, value, prize identifier or indicator, etc.* For example, the outcome may be "television," "ten-thousand dollars," "cherry," "orange," "4," "PI-173068," etc. The outcomes of "television" and "ten-thousand dollars" indicate specific prizes for the outcomes. The outcomes of "cherry" and "orange" indicate a specific outcome, but not specific prize or benefit associated with the outcome. *The controller 52, an intermediary, or other device or entity may then associate prizes or benefits to these outcomes at a later time and the associated prizes and benefits may vary.* For example, on one day an outcome of "cherry" may be associated with a prize of "ten dollars" while on the next day an outcome of "cherry" may be associated with a prize of "one hundred dollars." The outcome of "PI-173068" provides a specific outcome identifier, but like the "cherry" and "orange" outcomes, the outcome identifier does not indicate a specific prize or benefit associated with the outcome, thereby allowing a specific prize or benefit for the outcome to be determined by another entity or device and to change over time if desired.
>
> *Other prizes or benefits that may be associated with an outcome include a warrantee for a product . . . , . . . a discount . . . , a charity donation, a scholarship, an unlock code . . . , a password .*

15

> *. . , . . . a multiplier of an outcome unlocked or a prize won . . . ,*
> *an extender of time during which an unlock code or outcome can*
> *be used, . . . initiated or completed, a free hair cut, a coupon, . . a*
> *joke or other entertainment, a concert ticket, free car rental, free*
> *long distance telephone service, frequent shopper points,*
> *frequent flyer miles, a free movie rental, a sample of music or*
> *video, a game, a piece of a puzzle, all or part of a treasure map or*
> *game piece, etc.*
>
> A prize or benefit associated with an outcome may be merchant
> specific. . . .
>
> A prize or benefit associated with an outcome may also vary
> depending on the user that unlocks the outcome. . . .
>
> ***A prize or benefit may also allow a user to*** *continue to play a*
> *game* the user is playing on a user device, ***progress or change the***
> ***game*** the user is playing on the user device, ***or come to an end of***
> ***the game*** the user is playing on the user device. . . .

(*Id.* at 12:48-67) (emphasis added)  Defendants' example of a prize or benefit associated with an

outcome being "allow[ing] a user to . . . progress . . . the game" is within the plain and ordinary

meaning of "unlocked outcome."

Accordingly, Defendants' analogy of "playing a board game and not being able to move

forward until you roll a set of doubles" (C.A. 14-1070, D.I. 17 at 6) is not an "attempt[] to

construe claim 18 and dependent claims by ignoring elements of the claims and descriptions in

the specification" (C.A. 14-1070, D.I. 21 at 10).  With this in mind, the Court turns to the *Mayo*

analysis.

### *Mayo* Step 1: Are the claims directed to a patent-ineligible "abstract idea"?

"Under step one of *Mayo/Alice*, the claims are considered in their entirety to ascertain

whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp.*

*v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).

16

Plaintiff argues that the '198 patent "claims a specific solution to a specific problem associated with gaming on a mobile device, which itself is a recent advance. . . . Prior to the '198 patent, merchants conducting promotions faced problems dynamically changing a rule, benefit, prize, entry criteria, or redemption criteria." (C.A. 14-1070, D.I. 21 at 3) (citing '198 patent at 1:33-2:17) Plaintiff does not, however, assert that the claims of the '198 patent solve a problem *specific* to mobile devices, and, in any case, provides only a summary of the claims in support of its contention. (*See* C.A. 14-1070, D.I. 21 at 3, 12-14 & n.8) This is insufficient to differentiate the claims of the '198 patent from those at issue in, for example, *Bilski* and *Alice*, which were directed to abstract ideas that could be implemented using generic computer technology.[7]

Plaintiff further attempts to distinguish the claims of the '198 patent from the claims at issue in *Bilski* and *Alice* by arguing that they are not directed to a "fundamental economic practice." (*Id*. at 12) However, the Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in *Alice*, and Plaintiff cites no authority for the suggestion that "abstract ideas" are limited to fundamental economic practices. *See Alice*, 134 S. Ct. at 2357. In any event, the Court concludes that the "character as a whole" of the claims of the '198 patent *are* directed to a fundamental economic practice (as already explained and as further discussed below).

---

[7]Even if Plaintiff *is* suggesting that the problem solved by the claims of the '198 patent is unique to mobile devices, the specification establishes that the ability to change the promotion is *not* unique to the use of the claimed method on a mobile phone. The specification offers a proposed person-implemented solution to a problem that might arise from the ability of the game controller to change the promotion during the promotion: "Merchant A may have had a pre-published list or table of what an outcome of 'cherry' wins, thereby avoiding the perception that Merchant A has unfairly chosen a prize after the outcome of 'cherry' is revealed." ('198 patent at 8:29-33) Plainly, there is nothing unique to mobile phones about the idea of changing a promotion mid-promotion.

Plaintiff emphasizes that the Examiner considered "many . . . articles and publications . . . during publication . . . that relate to promotions or coupons and are directed to the same purported 'abstract idea' identified in Defendant's Motion." (C.A. 14-1070, D.I. 21 at 13) This fact does not help support a finding that the claims of the '198 patent are patentable. The references considered by the Examiner may very well have also been directed at an abstract idea. Similarly unavailing is Plaintiff's contention that the PTO's "issuance of the '198 patent *after* the Supreme Court's *Alice* decision is strong evidence that Defendants' characterizations cannot be correct" (C.A. No. 14-1071, D.I. 12 at 10-11) (emphasis in original); *see also* C.A. 14-1070, D.I. 21 at 2). As Defendants point out, "the Examiner issued the Notice of Allowance for the '198 patent on March 7, 2014, several months *before Alice* was decided and the Patent Office issued its new standards for determining validity under 35 U.S.C. 101." (C.A. 14-1070, D.I. 17 at 8 n.4) (emphasis added)

The Court agrees with Defendants that the claims of the '198 patent are directed to the economic strategy and abstract idea of "providing an 'unlock code' in exchange for a qualifying activity for an 'outcome' to reveal the [intra-game] benefit of the locked 'outcome'" (C.A. 14-1071, D.I. 11 at 2; C.A. 14-1067, D.I. 14 at 2), or, put more simply (yet still accurately), "using a code to unlock a benefit[] in a game" (C.A. 14-1070, D.I. 17 at 14). This abstract concept is not unlike the rules for any number of long-extant promotions, lotteries, or games, or other efforts to entice people to try a product or service. (*See, e.g.*, '198 patent at 1:33-37 (describing prior art and stating, "[m]erchants and manufacturers often use promotions to entice people to try or purchase products, shop or conduct transactions in certain stores, or to make people aware of products, store locations, etc."); *see also* C.A. 14-1071, D.I. 11 at 12-13 ("The specification of

the '198 Patent itself discloses both a conventional lottery-like implementation of concept where a player enters a drawing for a chance to win a prize, and a non-lottery implementation where a player obtains locked outcomes and then obtains unlock codes to determine the prizes contained in the locked outcomes.")) Further, as described above, the various dependent claims do no more than provide variations of the abstract idea applied to a generic mobile device or computer-readable medium.

Moreover, the claims of the '198 patent bear striking similarities to other types of subject matter that the Federal Circuit has found to be patent-ineligible. *See Ultramercial, Inc. v. Hulu LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014) (finding claims directed to users being given access to copyrighted media after viewing an ad to be unpatentable); *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. App'x 1005, 1008 (Fed. Cir. 2014) (finding claims for computerized bingo game unpatentable); *Gametek*, 597 Fed. App'x 644 (Fed. Cir. 2015) (finding patent directed to offering mid-game purchases in a video game failed to claim patent-eligible subject matter); *buySAFE*, 765 F.3d at 1355 (holding that "receiving a request" and "transmitting an offer in return" were abstract concepts). Like the claims at issue in these earlier cases, the '198 patent's claims recite limitations directed to receiving user inputs and responding to them by transmitting corresponding outcomes to the user. All of this further supports a conclusion that the '198 patent is directed to an abstract idea.

Thus, the Court concludes that all the claims of the '198 patent are directed to an abstract idea. It is necessary, then, to proceed to the second step of the analysis.

**_Mayo_ Step 2: Do the claims include an "inventive concept" sufficient to "ensure that the patent in practice amounts to significantly more" than a patent upon an ineligible concept?**

The claims of the '198 patent may still be patent-eligible if they include an "inventive concept" sufficient to "ensure that the patent in practice amounts to significantly more" than a patent upon an ineligible concept. *Alice*, 134 S. Ct. at 2355. The Supreme Court and Federal Circuit have held that there is no "inventive concept" if a claim recites an abstract idea implemented using "generic" technology to "perform well-understood, routine, and conventional activities commonly used in the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (citing *Alice*, 134 S. Ct. at 2359).

In both independent claims, the only steps that do not explicitly relate to the abstract idea relate either to a generic "mobile device comprising: an input mechanism . . . ; a display screen . . . ; a processor; [and] a memory . . . operable to store a first software program . . ." in the case of claim 1 ('198 patent at 38:50-60), or to a "computer-readable medium storing instructions for directing a processor of a mobile device to perform [the] method" in the case of claim 18 *(id.* at 40:13-15). However, "limiting the use of an abstract idea to a particular technological environment" is "not enough for patent eligibility." *Alice*, 134 S. Ct. at 2358 (internal quotation marks omitted).

The '198 patent's claims are implemented using generic mobile device technology that existed well before the priority date of the '198 patent. This is evident from the '198 patent's specification, which states:

> [I]t would be understood by one of ordinary skill in the art
> that ***the invention as described herein can be implemented*** in
> many different ways ***using*** a wide range of programming
> techniques as well as ***general purpose hardware systems*** or

20

dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences without departing from the scope of the present invention and *the claims should not be construed as being limited to any particular order or sequence*, unless specifically indicated. . . .

[M]any different types of implementations or hardware configurations can be used in the system 50 and with the methods 100, 200, 300, 500, 550 and *the methods disclosed herein are not limited to any specific hardware configuration. . . . The methods can be implemented in any sort or [sic] implementation of computer software, program, sets of instructions, code*, ASIC, or specially designed chips, logic gates, or other hardware structured to directly effect or implement such software, programs, sets of instructions, or code. The computer software, program, sets of instructions or code can be storable, writeable, or savable on any computer usable or readable media or other program storage device or media such as a floppy or other magnetic or optical disk, magnetic or optical tape, CD-ROM, DVD, punch cards, paper tape, hard disk drive, ZIP™ disk, flash or optical memory card, microprocessor, solid state memory device, RAM, EPROM, or ROM. The term *'computer-readable medium' as used herein refers to any medium that directly or indirectly participates in providing instructions to a processor for execution*. Such a medium may take many forms, including but not limited to, non-volatile media, volatile media, and transmission media. Non-volatile media include, for example, optical or magnetic disks. Volatile media include dynamic random access memory (DRAM). Transmission media include coaxial cables, copper wire and fiber optics, including the wires that comprise a system bus coupled to a processor. Transmission media can also take the form of acoustic, electrical, or electromagnetic waves, such as those generated during radio frequency (RF) and infrared (IR) data communications.")

('198 patent at 37:24-38:9) (emphasis added) Thus, here, as in *Bancorp*, "[t]he computer required by [the] claims is employed only for its most basic function, . . . and as such does not impose meaningful limits on the scope of those claims." 687 F.3d at 1278.

21

Plaintiff disputes these conclusions in several ways, all of which are unavailing.[8] First,

Plaintiff argues that the claims of the '198 patent meet the machine-or-transformation test, but in

support of this proposition Plaintiff points only to the use of a "mobile device" in connection

with the other claim limitations. (*See* C.A. 14-1070, D.I. 21 at 14, 16) To the contrary, many

exemplary embodiments in the specification indicate that the mobile device is not integral to the

performance of the claimed method: the user can obtain the "unlock code" through "an

intermediary's employee [who] can also personally transfer or verbally communicate the code to

the user" ('198 patent at 26:23-38); the "unlock code" can be a "spoken . . . password" (*id.* at

5:43-44); a user may receive an "unlock code" through the mail (*id.* at 7:18-21); a user may

unlock the "locked outcome" by "scratch[ing] off the space indicated by the code" or

"unlock[ing] the contraption using the key" (*id.* at 27:64-28:23); a user may download "locked

outcomes" from a website (*id.* at 7:57-60); and a user may receive a "free haircut," "game piece,"

"warrantee on a product," or "golf lesson from a professional golfer," as a benefit "associated

with" a "locked outcome" (*id.* at 13:1-19, 22:51-55) – all of which do not require a mobile

device.

The same is true for the dependent claims. For instance, verification of a qualifying

activity pursuant to dependent claim 12 (*id.* at 39:54-57) can be performed by the "intermediary's

representative . . describ[ing] or attempt[ing] to ascertain the user's interest level in the can of

soup" (*id.* at 25:67-26:8).

---

[8]Plaintiff's conclusory statements that the claims show "(i) an inventive concept, (ii) more
than a drafting effort designed to monopolize the abstract idea; (iii) improving an existing
technological process; *and* (iv) 'a 'new and useful' application of the idea'" (C.A. 14-1071, D.I.
21 at 16) (emphasis in original), are mere assertions, not supported by the materials the Court has
before it (and is permitted to consider).

The claims, therefore, do not satisfy the machine-or-transformation test because neither the claims nor the specification of the '198 patent recite any machine that plays a "***significant*** part in permitting the claimed method to be performed." *SiRF Tech.*, 601 F.3d at 1333 (emphasis added). Rather, the "standard" mobile device and computer-readable medium recited as implementing the claimed invention ('198 patent at 38:50-60, 41:13-15) is used "solely as an obvious mechanism for permitting a solution to be achieved." *SiRF Tech.*, 601 F.3d at 1333.

Second, Plaintiff argues that the claims do not preempt every application of the abstract idea to which they are directed, pointing out that "the cited prior art remains available for practice by Defendant." (C.A. 14-1070, D.I. 21 at 3)

> [A]lthough courts have framed the 'second-step' analysis in terms of preemption, there is no rule that ideas that do not preempt an entire field are per se patent eligible. Rather, the test as articulated by *Alice* is that there must be an inventive contribution on top of the underlying abstract idea.

*Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, 2015 WL 436160, at *5 (D. Del. Jan. 27, 2015). As the Supreme Court explained in *Alice*, one focus of the second step of the *Mayo* test is whether the claims "***disproportionately*** t[ie] up the use of the underlying ideas." 134 S. Ct. at 2354 (emphasis added; internal quotation marks omitted). The Court concludes that the claims of the '198 patent do disproportionately tie up use of the underlying ideas of the '198 patent.

Moreover, the Federal Circuit recently stated: "Where a patent's claims are deemed only to disclose patent ineligible subject matter under the *Mayo* framework, as they are in this case, ***preemption concerns are fully addressed and made moot***." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) (emphasis added). The Court finds that

23

the claims of the '198 patent disclose only patent-ineligible subject matter. Therefore, Plaintiff's preemption arguments are moot.

Finally, Plaintiff analogizes the claims of the '198 patent to the claims at issue in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2004). Plaintiff argues that, as in *DDR*, the claims of the '198 patent "do not recite . . . a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations." *Id.* at 1259. In the Court's view, however, as discussed above, the claims here *do* recite standard use of a conventional mobile phone in its normal, expected manner. The fact that they recite a particular method of using an "unlock code" to obtain a "locked outcome" does not change this reality. "Simply appending conventional steps, specified at a high level of generality, [is] not *enough* to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted; emphasis in original).

Yet, conventional steps, specified at a high level of generality, are the sum total of what the claims of the '198 patent monopolize. Although the claims of the '198 patent are limited to a particular technological environment – i.e., mobile devices – this does not save them from being ineligible for patentability. *See id.* at 2358.

Therefore, the Court determines that the claims of the '198 patent are ineligible under § 101, because they are directed to an abstract idea and include no inventive concept under *Mayo/Alice*.

## CONCLUSION

For the reasons given above, all claims of the '198 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101. The Court will grant Defendants' motions. An appropriate order follows.